UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CARL BURCKHARDT, | : | Docket No. 3:19-cv-619 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. OLSCHAFASKIE, ALEX | : | |
| COLLAZO, ACE TRANSPORTATION | : | |
| LLC, EAST HARTFORD CAB | : | |
| COMPANY, INC., ACE TAXI SERVICE, | : | |
| INC. and CONNECTICUT MEDICAL | : | |
| DISPATCH LLC | : | |
| | : | |
| Defendants. | : | April 25, 2019 |

**COMPLAINT**

The plaintiff, Carl Burckhardt, by and through undersigned counsel, hereby complains of Defendants Michael J. Olschafskie, Alex Collazo, ACE Transportation LLC, East Hartford Cab Company, Inc., ACE Taxi Services, Inc. and Connecticut Medical Dispatch LLC, as follows:

**PRELIMINARY STATEMENT**

1.      This action seeks to remedy the defendants' bad faith and actionable conduct to lure the plaintiff into providing valuable services, along with confidential, proprietary and other valuable trade secrets, for the defendants' transportation businesses, including running up nearly $100,000 of charges on plaintiff's credit card, and then refusing to close the agreed-upon purchase and sale of such businesses for approximately $2,750,000.

2.      In 2016, plaintiff and defendants initiated discussions on the terms and conditions to purchase and sell the equity interests of defendant ACE Transportation LLC, East Hartford Cab Company, Inc., Connecticut Medical Dispatch LLC and ACE Taxi Services, Inc., each of

which were, at the time, beneficially owned, in whole or in part, by defendant Michael J. Olschafskie.

3.      After initial discussions materialized into mutual promises to enter into the transaction and performance of the purchase and sale agreement, plaintiff rendered valuable services to the defendants for which he was not entirely compensated. As a result, defendants benefited from plaintiff's services, including by plaintiff's providing valuable trade secret information.

4.      Even worse, plaintiff incurred business expenses on behalf of the defendants and even loaned money to make payroll in 2017, all in reliance on the defendants' oral and written promises, assurances and representations to close the purchase and sales transaction.

5.      During substantive purchase and sale negotiations, plaintiff shared proprietary and confidential trade secret information to improve the defendants' business, which he intended in good faith to purchase and which he remains able and willing to do, in the wake of increased market competition and technological improvements, including by way of industry disrupters such as Uber and Lyft.

6.      All in all, when plaintiff became involved in the defendants' business in 2016, the businesses were disorganized and technologically behind the market curve. As a result of plaintiff's tangible and intangible contributions to the defendants and their business, the businesses vastly improved during the period when the parties were trying to close the transaction. Realizing the tremendous value provided by the plaintiff before closing, the defendants breached agreements, engaged in other wrongful and unlawful conduct, cut off all communications with the plaintiff, and then failed to compensate and reimburse him.

## JURISDICTION AND VENUE

7.      This Court has both diversity and federal question subject matter jurisdiction under (a) 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states; and (b) 28 U.S.C. § 1331 as this action arises under The Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836.

8.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) as all the defendants are residents of this judicial district and 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in this judicial district.

## PARTIES

9.      Plaintiff Carl Burckhardt is a natural person, a citizen of the State of California, and resides at 4876 Cherokee Dr., Concord, CA 94521.

10.     Defendant Michael J. Olschafskie is a natural person, a citizen of the State of Connecticut, and resides at 11 Rolocut Rd., East Windsor, CT 06016.

11.     Defendant Alex Collazo is a natural person, a citizen of the State of Connecticut, a member of CMD, and maintains an address at 40 Tolland Stage Road, Tolland, CT 06084. The records of the Connecticut Secretary of State for CMD confirm Mr. Olschafaskie assigned, transferred, or otherwise conveyed all or some of his membership interest in CMD to Mr. Collazo.

12.     Defendant ACE Transportation LLC ("**ACE Transportation**") is a limited liability company formed and existing under the laws of the State of Connecticut, and maintains its principal place of business at 73 West Street, Vernon, CT 06066. Each of its members,

including Mr. Olschafskie, is a citizen of the State of Connecticut, and none of them are citizens of the State of California. At all times relevant hereto, Mr. Olschafskie was an authorized agent of ACE Transportation and had control over ACE Transportation.

13.     Defendant East Hartford Cab Company, Inc. ("**Cab Company**") is a domestic stock corporation incorporated under the laws of the State of Connecticut, and maintains its principal place of business at 134 East Center St., Manchester, CT 06040. Mr. Olschafskie is the president and treasurer of Cab Company. At all times relevant hereto, Mr. Olschafskie was an authorized agent of Cab Company and had control over Cab Company.

14.     Defendant ACE Taxi Services, Inc. ("**ACE Taxi**") is a domestic stock corporation incorporated under the laws of the State of Connecticut, and maintains its principal place of business at 134 East Center St., Manchester, CT 06040. Mr. Olschafskie is the president and treasurer of ACE Taxi.

15.     Defendant Connecticut Medical Dispatch, LLC ("**CMD**") is a limited liability company formed and existing under the laws of the State of Connecticut, and maintains its principal place of business at 40 Tolland Stage Rd., Tolland, CT 06084. Each of its members is a citizen of the State of Connecticut, and none of them are citizens of the State of California.

## BACKGROUND FACTS

### A.     PLAINTIFF'S INDUSTRY AND PROFESSIONAL BACKGROUND

16.     Plaintiff is an investor and highly-renowned professional and business consultant and advisor in the technology industry commanding industry-standard compensation structures.

17.     He has been involved as an employee and contractor in various industries, such as storage, technology, marketing.

18.     He has a notable track record of using technology and developing proprietary methods and confidential information to improve and scale businesses that have not implemented such methods and information to grow efficiencies, bottom line and market share.

B.     **PLAINTIFF INITIATED DISCUSSIONS WITH THE DEFENDANTS IN 2016**

19.     In 2016, plaintiff became interested in pursuing an investment and involvement in the on-demand transportation industry, and he became aware of an opportunity with the defendants.

20.     Mr. Olschafskie runs several affiliated transportation companies: defendants ACE Transportation, Cab Company, ACE Taxi and CMD (the "**Entity Defendants**").

21.     When plaintiff first initiated conversations with Mr. Olschafskie, the Entity Defendants were lagging in the transportation market, lacked a mobile application for customers to self-book transportation services offered by the Entity Defendants, and lacked a business plan to grow efficiencies, bottom line and market share in the increasingly-competitive transportation market.

22.     By December 2016, plaintiff had spent significant time and energy into becoming involved with and negotiating to purchase the equity interest of the Entity Defendants, and plaintiff and Mr. Olschafskie had progressed discussions for plaintiff's involvement in the Entity Defendants' business and the purchase of the equity interests of the Entity Defendants.

23.     As part of those discussions during that time period, plaintiff and Mr. Olschafskie had discussed a framework, subject to an agreement on confidentiality, non-use and non-disclosure with the defendants, for the purchase and sale of the equity interests in the Entity Defendants.

24.     Subject to further diligence, plaintiff communicated a purchase and sale transaction preliminarily in the range of Two Million Five Hundred Thousand Dollars to Two Million Seven Hundred and Fifty Thousand Dollars ($2,500,000-$2,750,000) with an earn-out payable to Mr. Olschafskie equal to five to ten percent (5-10%) of the annual profit based on the financial performance of the Entity Defendants and Mr. Olschafskie's continued participation in the business of the Entity Defendants.

25.     To grow the Entity Defendants' businesses, plaintiff believed a substantial investment in technology and personnel was required. For example, plaintiff communicated to Mr. Olschafskie by email on December 9, 2016, that the Entity Defendants required an investment approximating between One Million Dollars to One Million Five Hundred Thousand Dollars ($1,000,000-$1,500,000).

26.     Such investment would be used, in part, to develop a mobile application and other data warehousing technology so that, for instance, customers could self-book transportation services of the Entity Defendants, and the Entity Defendants could compete with Uber and Lyft.

27.     Plaintiff also recommended such investment to be used for hiring competent and experienced industry professionals not already employed by the Entity Defendants, such as a business and operating manager, a technology and development team, a financial professional and a marketing professional.

28.     Plaintiff communicated to Mr. Olschafskie that such financial investment in technology and personnel would allow plaintiff to modernize the business during a period of disruption by Uber and Lyft with the ultimate goal of acquiring competitors to gain market share.

29.     To rationalize the financial investment in technology and personnel, and continuing during this December 2016 period, plaintiff communicated to Mr. Olschafskie his concerns in the Entity Defendants' then-current business model, such as:

        a.      The transportation industry is undergoing a major disruption having continued permanent impact to businesses by the likes of Uber and Lyft.

        b.      Consumers will continue to use Uber's and Lyft's then-ubiquitous services for on-demand transportation, resulting in loss market share for the Entity Defendants.

        c.      The Entity Defendants should focus on growing technology platforms to compete with the likes of Uber and Lyft, so the Entity Defendants could "win back" some customers.

        d.      Other competitors, such as Logisticare Solutions LLC, are lowering customers costs to gain market share, which will further impact the Entity Defendants' business model and financial results.

        e.      Other competitors, such as Logisticare Solutions LLC, Uber and Lyft, have self-booking technology platforms not offered by Entity Defendants, and the advent of driverless-cars pose a substantial threat to the viability of the Entity Defendants.

        f.      Increasing personnel and acquiring competitors may cause anxiety to current Entity Defendants personnel, which may result in turnover, so an investment in competent personnel is paramount for a services business such as the Entity Defendants.

C.      **PLAINTIFF STARTS RENDERING SERVICES FOR THE ENTITY DEFENDANTS**

30.     Plaintiff and Mr. Olschafskie continued discussing a framework in December 2016 and January 2017 for plaintiff's involvement and investment in the Entity Defendants.

31.     With the investment discussions ongoing, Mr. Olschafskie conferred broad authority on and appointed the plaintiff as the General Manager to manage, run, repair and restructure the Entity Defendants. The plaintiff accepted such appointment as General Manager and rendered valuable services accepted by the Entity Defendants since early 2017.

32.     Indeed, Mr. Olschafskie required plaintiff to render, and plaintiff in fact rendered, services on site at the Entity Defendants beginning as early as March 2, 2017.

33.     On March 8, 2017, plaintiff sought reaffirmation from Mr. Olschafskie of plaintiff's authority within the Entity Defendants.

34.     Mr. Olschafskie responded to plaintiff: "I want out, you want in, I am going to make this happen."

35.     Part of the management issue arose from Entity Defendants personnel not having the experience that the plaintiff had to manage and run the business. Mr. Olschafskie acknowledged the Entity Defendants' management problem necessitating the plaintiff's saving the Entity Defendants, stating "I am sure it is 14 years of John and Jim blaming me for their shortcoming….they had the authority but never did their job."

36.     When plaintiff became involved in the Entity Defendants' business, he immediately became aware of management inefficiencies, including disorganized books and records, improper team and management structuring, reporting and team-leadership issues, process and procedure problems, and technology and partner inefficiencies.

37.     Not only did the plaintiff reach his own conclusions about those inefficiencies, but Mr. Olschafskie communicated to the plaintiff his own opinions about what must be fixed and what he wanted plaintiff to focus on:

      a.     "There is a definite income / profit problem at this company";

      b.    "There are things not being addressed having to do with raising the profit margins";

      c.    "[W]ork was not being picked up";

      d.    "[F]ront office is not being managed";

      e.    "I get 30 emails a day not one said we were in danger of losing contract/cash work";

      f.    "My emails are asking about drivers, not knowing that there were no cars";

      g.    "Mismanagement 101";

      h.    "Also we are flooded with Logisticare work which does not pay well, so the profits are slim";

      i.    "Presently ACE is 3 months behind on car loan payments";

      j.    "[T]here is not enough cars/drivers".

38.    With those problems, Mr. Olschafskie sought opinions from the plaintiff, such as "I need to know if you have enough cars and drivers in your report, also any other problems on your shift" and "I need you to tell me in a response to this that you will give the report and understand what I need."

39.    Plaintiff restructured the Entity Defendants' internal personnel teams, the internal reporting structure and the leadership for each department. For example, the Entity Defendants were wrought with logistical planning and management issues and had challenges in securing drivers for routine transportation services for or on behalf of the Connecticut Department of Children and Families. Further, Mr. Olschafskie told plaintiff that Mr. Olschafskie had difficulty with hiring qualified personnel and otherwise managing the business. Indeed, on several

occasions, plaintiff heard Mr. Olschafskie berate and belittle employees and consultants of the

Entity Defendants including by yelling at them and calling them "stupid" and "idiots," for

example. So, plaintiff implemented a departmental structure appointing a team-leader for certain

accounts to create accountability and management efficiencies.

40.     Additionally, in reliance on and based on his agreement with the defendants,

plaintiff started implementing his confidential and proprietary model, which included his know-

how in analyzing, growing and scaling business, customers and revenue streams derived from his

industry experience including in insurance, gambling, retail and aviation (the "**Model**") to update

technology services so the Entity Defendants could market themselves and be perceived as an

authoritative and technologically-improving service provider.

41.     Next, plaintiff caused the Entity Defendants to purchase two Toyota Priuses and

one Ford Focus so that plaintiff could enhance the Entity Defendants' marketing perception as a

"green" and environmentally-friendly company and to lower fuel costs. Plaintiff incurred fees

and expenses arising from the purchase of Priuses, Corollas, Camry's, a Rav4 and an Avlon for

the benefit of the defendants.

42.      Plaintiff further communicated his plans to create a unified fleet of vehicles,

meaning a fleet comprising of one-to-two models of vehicles for uniformity and consistent

branding. He further continued to work on his plan to increase technology updates, web and

customer experience platforms, and rebranding and marketing the business of the Entity

Defendants.

43.     Also, in March 2017, plaintiff uncovered Entity Defendants unbilled activity

totaling approximately One Hundred Thousand Dollars ($100,000) arising from transportation

services provided for and on behalf of multiple accounts, including, for example, Logisticare

Solutions LLC or its affiliate, and plaintiff also uncovered that Mr. Olschafskie had caused the Entity Defendants to fall behind paying vendors and utilities by, in some circumstances, ninety (90) days.

44.     In as early as one month in March 2017, plaintiff became an integral part of the business of the Entity Defendants and a trusted consultant for Mr. Olschafskie, who sought to continue being, in his words, "an arm's length away from the company."

45.     By late-May 2017, Mr. Olschafskie had also confirmed plaintiff's appointment as Vice President of Marketing and Technology. In that role, plaintiff was to update the Entity Defendants' technology systems, including telephones, online and with dispatching services, garage, billing and accounting software, data and analytics, consumer-facing apps and products and marketing programs.

46.     In the period before the plaintiff tendered a letter of intent to Mr. Olschafskie on June 7, 2017, the plaintiff had made material improvement to the business, including, without limitation, working approximately seven days a week, twelve hours a day and expanding the relationship with the Connecticut Department of Children and Families resulting in revenue increasing from $2,000-$4,000 per week to upwards of $30,000 per week.

47.     In addition to the financial improvements in the Entity Defendants, the plaintiff incurred substantial unreimbursed actual expenses for the Entity Defendants.

48.     All in all, and in addition to the other services set forth therein, the plaintiff rendered substantial and valuable services for the benefit of and on behalf of the Entity Defendants, all at the direction and with the knowledge, authorization and acceptance of Mr. Olschafskie:

a.      Took over operations of the Entity Defendants in conjunction with Mr. Olschafskie's relieving Entity Defendant personnel of responsibilities conferred on plaintiff;

b.      Managed the Entity Defendants' computer systems, including implementing a new email system, setting up email groups, office productivity products such as Microsoft Office 365, and providing email addresses to all Entity Defendants' personnel;

c.      Negotiated the termination of Entity Defendants personnel;

d.      Engaged in substantial diligence on the operations and financials of the business;

e.      Improved relationships with Entity Defendants customers, including the Connecticut Department of Children and Families;

f.      Hired and transitioned personnel into a new reporting and organizational structure;

g.      Participated substantially in the day-to-day and the strategic operations and planning of the Entity Defendants;

h.      Automated credit card processing;

i.      Implemented new payroll and timecard software tracking services;

j.      Managed fleet garage, maintenance, registration and compliance issues;

k.      Implemented backup vehicle repair and automatic purchasing partnerships to more quickly fill car services;

l.      Attended meetings at the hospital with Mr. Olschafskie to provide transparency into business operations;

m.      Assessed, suggested and implemented improvements for dispatchers and dispatch systems;

      n.      Implemented ordered logistics for supply and office equipment;

      o.      Facilitated accounting reporting processes, procedures and solutions;

      p.      Attended various meetings with Entity Defendants clients, including Logisticare Solutions LLC and Connecticut Department of Children and Families;

      q.      Began negotiating with successor dispatch-solutions partner;

      r.      Negotiated and realized cost savings with hardware and telecommunication service provides; and

      s.      Attended the TLPA conference on behalf of the Entity Defendants.

49.      Plaintiff also helped remodel and improve ACE Transportation's website, http://acetransportsct.com/ (last accessed April 25, 2019), which touts itself as a "full-service company providing transportation 24 hours a day, 7 days a week to Hartford, Tolland and Windham counties and all major northeast airports."

50.      Among the improvements to the website, plaintiff facilitate clarity in marketing transportation services to different rider demographics:

      a.      Airport Transportation:  It provides "dedicated transportation to and from Bradley Airport," "24-hour vehicle services," and "Door-to-door transportation to all major international airports in the Northeast corridor."

      b.      Student Transportation: It provides "[r]eliable transportation services to various educational facilities across Connecticut," and "accommodate[s] transportation to college students, preparatory students, and handicapped students."

      c.      Medical Transportation: It "[s]pecializ[es] in community & social service non-emergency medical transportation," and "Medicaid programs as well as other public agencies are some of the transportation types [it] provide[s] to public or non-profit agencies."

     d.     Wheelchair Transportation: It "offer[s] wheelchair accessible taxi services for students, special needs, and non-emergent medical passengers," and markets that "All drivers on staff are trained to use and assist passengers with equipment."

     e.     Car Hire On Demand: It provides on-demand transportation services, being "Available 24/7, 365," and its "curb to curb car hire on demand is offered in Hartford, Tolland, and Windham counties," where a rider may request services "online, via phone, or on [its] easy to use smartphone app."

(collectively, the "**ACE Transportation Services**").

     51.     Plaintiff also revitalized the Entity Defendants' website by advertises various reasons to choose ACE Transportation Services, such as:

     a.     ACE Transportation has a moral leadership mission and vision driven down from the top, giving back to business and community.

     b.     ACE Transportation is one of Connecticut's most technologically-advanced, reliable, full-service transportation company.

     c.     ACE Transportation's same-digit phone numbers make it easy for customers to contact us whenever they need a ride: 24 hrs a day, 7 days a week.

     d.     ACE Transportation's computer dispatch system uses GPS tracking, minimizing customer wait-times.

     e.     ACE Transportation features a state-of-the-art telecommunications systems providing reliable communication between customers, service reps and drivers.

     f.     ACE Transportation dispatch always checks weather and traffic conditions to keep our drivers informed of the safest and most direct routes.

g.    ACE Transportation operates wheelchair-accessible vehicles to provide equal transportation access for all.

h.    ACE Transportation accepts credit or debit cards for any transportation need or lifestyle to provide cash-less cab rides.

52.    Plaintiff also is the sole reason why ACE Transportation now facilitates transportation bookings and further markets ACE Transportation Services through mobile applications (the "**ACE Apps**") available for download on the App Store maintained by Apple, Inc. and Google Play maintained by Google LLC.

**D.    THE PARTIES ENTER INTO, AND BEGIN TO PERFORM, THE AGREEMENT**

53.    On June 7, 2017, plaintiff submitted a letter of intent to, among other things, purchase all of the equity interest in the Entity Defendants for a purchase price of Two Million Seven Hundred Fifty Thousand Dollars ($2,750,000) through a purchase-money promissory note providing for amortized payments based on a twenty-year term with interested fixed at four percent (4%) per year (the "**Purchase Price**"), all as set forth in greater detail therein (the "**LOI**").

54.    The LOI set forth the agreement by, between and among plaintiff, Mr. Olschafskie and the Entity Defendants whereby plaintiff, on the one hand, and Mr. Olschafskie and the Entity Defendants, on the other hand, promised each other to complete a purchase and sale of the equity interest in and the assets of the Entity Defendants for the Purchase Price, and for Mr. Olschafskie and the Entity Defendants to reimburse the plaintiff for temporary and short-term lodging fees, which was thereafter reaffirmed and confirmed on multiple occasions in writing and verbally (the "**Agreement**") on the terms and conditions reflected in the LOI, including, for example:

15

     a.    The purchase and sale of the membership interests and issued and outstanding shares of the Entity Defendants;

     b.    The purchase and sale of the Entity Defendants assets, including all usable and non-usable inventory (together with any rebates attached thereto), trade accounts receivable, fixed assets including furniture, fixtures, equipment, motor vehicles, license and permits, contract rights, leases, trade names, customer lists, good will and intellectual property;

     c.    The liabilities of the Entity Defendants for the accounts payable, equipment loans on fixed assets and motor vehicle loans and obligations arising under purchase orders and contracts in the ordinary course of business and sales orders;

     d.    The lease of certain real estate located at 40 Tolland Stage Road;

     e.    Covenant of non-competition in favor of the plaintiff and against Mr. Olschafskie; and

     f.    A break-up fee calculated on the basis of a certain rate multiplied by fifty-five (55) hours for the number of weeks by which the Entity Defendants have been managed by plaintiff.

55.    After plaintiff's circulating the LOI, the parties began to perform the Agreement.

56.    In those discussions in late July 2017, Mr. Olschafskie continued to tell the plaintiff that Mr. Olschafskie would circulate an executed version of the LOI and that the parties would complete the closing:

     a.    First, on or about May 8, 2017, Mr. Olschafskie told plaintiff that Mr. Olschafskie would close the Agreement at the end of May 2017;

     b.    Second, after not closing the Agreement in May 2017, plaintiff incurred attorneys' fees and expenses to draft and circulate the LOI in order to expedite the closing of the

Agreement in response to which Mr. Olschafskie told plaintiff that Mr. Olschafskie would close the Agreement at the end of July 2017;

        c.     Third, due to Mr. Olschafskie's medical procedure in July 2017 and not closing the Agreement in July 2017, Mr. Olschafskie told plaintiff that Mr. Olschafskie would close the Agreement at the end of August 2017; and

        d.     Fourth, after not closing the Agreement in August 2017, Mr. Olschafskie told plaintiff that Mr. Olschafskie would close the Agreement at the end of October 2017.

57.    During that period, the parties continued to perform the Agreement. Indeed, plaintiff relied on Mr. Olschafskie's representations that the Agreement would close in 2017 and, in that regard, Mr. Olschafskie told plaintiff in July 2017 that, since plaintiff will eventually own the Entity Defendants after the closing at the end of July 2017, plaintiff should start incurring fees on behalf of the Entity Defendants and acting as if plaintiff is the owner of the Entity Defendants.

58.    Taking Mr. Olschafskie at his word and relying on the Agreement, the LOI and Mr. Olschafskie's multiple representations from May to October 2017, plaintiff began to, and continued to, in fact, incur from July 2017 up through and including February 2018 nearly Two Hundred Thousand Dollars ($200,000) of business expenses on his Citi Business, Citi Executive and Chase credit cards (the "**Credit Cards**") for the benefit of and on behalf of the Entity Defendants.

59.    During that period, plaintiff communicated to Mr. Olschafskie and the Entity Defendants that plaintiff was incurring business expenses on his Credit Cards as early as July 2017 for the benefit of and on behalf of the Entity Defendants.

60.     During that period, plaintiff provided copies of the monthly Credit Card statements to Mr. Olschafskie and the Entity Defendants and otherwise made full disclosure to Ms. Olschafskie and the Entity Defendants of the charging of the business expenses on his Credit Cards.

61.     Despite Mr. Olschafskie's admission that "he intends to reimburse Carl for every legitimate business expense," defendants have failed to reimburse plaintiff for all business expenses, including interest accrued thereon, on his Credit Cards incurred for the benefit of and on behalf of the Entity Defendants. In December 2017, Mr. Olschafskie again was "telling [plaintiff] in front of 2 lawyers that [he] will pay all ACE bills that [plaintiff] paid."

62.     Recognizing plaintiff's value to the Entity Defendants, Mr. Olschafskie tasked plaintiff with retooling the Entity Defendants' cloud-based services and website, including the URL, www.acetransportationct.com, and setting up for the Entity Defendants a Google Suite accounts: the business suite of cloud-based office products such as word processing, spreadsheets, presentations and emails tools offered by Google.

63.     Mr. Olschafskie admits that the URL and the Google Suit are "critical to the functioning" of the Entity Defendants and that plaintiff "set these up". The URL and the Google Suite remain assets of the plaintiff – not an asset of any of the defendants as Mr. Olschafskie suggested to the plaintiff as late as January 2018.

64.     In reliance on the Agreement and the LOI, and the various representations made by Mr. Olschafskie, the plaintiff turned down other business and financial opportunities, including a position as the Head of Global Marketing at Dyson and a few other companies where his salary, exclusive of incentive-based compensation, would exceed Two Hundred and Fifty

Thousand Dollars ($250,000) per year. Plus, due to the defendants' wrongful conduct, plaintiff has been unable to secure alternative work or employment.

65.     Due to the failure by the defendants to reimburse plaintiff for the liability on the Credit Cards, plaintiff's credit scored has dropped substantially from 805 to less than 650, further impacting his personal financial health.

66.     In addition, plaintiff made two (2) payments to Mr. Olschafskie, who accepted those two (2) payments, under the and in performance of the Agreement and LOI, which constitute payments of the Purchase Price by the plaintiff to Mr. Olschafskie.

67.     Plaintiff loaned the Entity Defendants approximately Ten Thousand Dollars in September 2017 to cover payroll expenses.

68.     Then, in November 2017, Mr. Olschafskie and the plaintiff had a dispute regarding Mr. Olschafskie's improperly withdrawing over $200,000 from Entity Defendants' accounts (the "**Withdrawal**").

69.     Plaintiff confronted Mr. Olschafskie about the Withdrawal as it barely left Entity Defendants with working capital to make payroll. In response, Mr. Olschafskie said "I will look at that…but you were left a lot in receivables, lol…***deal of the century for you***".

**E.    MR. OLSCHAFSKIE AND THE ENTITY DEFENDANTS USE IMPROPER MEANS TO ACQUIRE PLAINTIFF'S TRADE SECRETS**

70.     Mr. Olschafskie and the Entity Defendants made various representations and promised to close the Agreement and LOI with plaintiff. At the time Mr. Olschafskie made those representations and promises, he knew they were false, and he had no intention of performing them. Relying on those false representations and promises, plaintiff disclosed his confidential and proprietary information and trade secrets to Mr. Olschafskie and the Entity Defendants.

71.     Plaintiff has developed confidential and proprietary information and trade secrets over the course of his career, and has invested extensive time, effort, money and creativity in building and developing his know-how, models, financial plans, marketing initiatives, personnel and department structuring, marketing strategies, and technology tools for businesses, including confidential and proprietary information and trade secrets relating to, among other things:

a.     A mobile application for customers to self-book transportation services such as those offered by the Entity Defendants through the ACE Apps;

b.     A business plan to grow efficiencies, bottom line and market share in the increasingly-competitive transportation market;

c.     Forecasting financials and building models to predict revenue all the while excluding certain irrelevant factors, which may include seasonality and anomalies with revenue peaks, to better plan business opportunities and ensure steady streams of revenue;

d.     The Model;

e.     Sales and marketing activities, strategies and plans regarding customer profiles and segments; pricing strategies; customer-acquisition tools in the ride-sharing and transportation market; increasing marketing effectiveness of regional transportation providers through the bundled use of interactive websites (which plaintiff had perfected while consulting for Virgin America when launched in the Dallas market by targeting customers' existing airlines and receiving texts with services availability), mobile application and payment processing systems; separating product segments and offerings among demographics;

f.     Short- and long-term business plans and strategies regarding internal cost reporting; recognizing billing and invoicing inefficiencies to capitalize on delayed invoicing and revenue (which plaintiff had disclosed to defendants an automations system for capturing

20

delayed revenue leading up to and after winning a valuable contract with the State of Connecticut); internal personnel, team and reporting structures; research and technology initiatives; emerging market growth and opportunities; logistical explanation, efficiency growth and planning; go to market strategies; and expanding lines of business and projections (all collectively, the "**Trade Secrets**").

72. Plaintiff is the sole owner and proprietor of all right, title and interest in and to the Trade Secrets.

73. In reliance on defendants' various representations and promises, particularly the closing of the Agreement and LOI, plaintiff disclosed the Trade Secrets to the defendants.

74. Plaintiff takes responsible steps to safeguard the Trade Secrets. Plaintiff stores them in a secure location and limits access only to individuals having a need to know the Trade Secrets or otherwise promising to maintain confidences, not disclose them and not use them other than the purpose for which disclosure is made.

75. Plaintiff provided the Trade Secrets to Mr. Olschafskie and the Entity Defendants in exchange for their promise to close the Agreement and LOI, maintain the Trade Secrets in confidence, not use the Trade Secrets other than through the plaintiff and plaintiff's involvement in the Entity Defendants and under the Agreement and LOI, not disclose it to any unaffiliated third party or any personnel not having a need to know the Trade Secrets, and return the Trade Secrets to plaintiff if plaintiff was no longer involved with the Entity Defendants or if the Agreement and LOI did not close.

76. Plaintiff would not have disclosed the Trade Secrets to Mr. Olschafskie and the Entity Defendants but for the foregoing promises and representations.

77.     Plaintiff implemented the protective measures to prevent his Trade Secrets from unauthorized use, so that others cannot unjustifiably reap the benefits of plaintiffs' extensive investment in labor and innovation of the Trade Secrets.

78.     Prior to plaintiff's disclosure of the Trade Secrets to Mr. Olschafskie and the Entity Defendants, they had no knowledge of and did not use any of plaintiff's Trade Secrets.

79.     The Trade Secrets have independent economic value from not being generally known to, and not readily ascertainable through proper means, by another person. The Trade Secrets are crucial to business growth, efficiency, profit generation, increased market shares, increased customer interaction, goodwill creation and growth, increased technological efficiencies, cost savings and other increased customer interaction and revenue.

**F.     MR. OLSCHAFSKIE REFUSES TO CLOSE THE AGREEMENT AND LOI AND CONTINUES TO USE PLAINTIFF'S TRADE SECRETS AND OTHER BENEFITS WITHOUT PAYMENT**

80.     By February 2018, Mr. Olschafskie communicated to plaintiff that Mr. Olschafskie will not close the Agreement and LOI. Mr. Olschafskie and the Entity Defendants continue to use Trade Secrets in violation of their agreement with the plaintiff. Plaintiff has fully performed the Agreement and LOI, to the extent he was able due to the defendants wrongfully preventing any additional performance by the plaintiff.

## CLAIMS FOR RELIEF

### COUNT I
### (VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836))

81.     Plaintiff incorporates paragraphs 1 through 80 of his complaint as if fully set forth herein.

82.     Defendants' conduct constitutes a violation of The Defend Trade Secrets Act, 18 U.S.C. § 1836.

83.     Plaintiff is the owner of the Trade Secrets, which are related to services used or intended for use in interstate or foreign commerce.

84.     Plaintiff disclosed the Trade Secrets subject to confidentiality, non-use, and nondisclosure restrictions, and contingent on the closing of the Agreement and LOI.

85.     Defendants misappropriated the Trade Secrets by knowingly acquiring the Trade Secrets through improper means, namely, by making false statements and promises and otherwise fraudulently inducing the plaintiff to disclose the Trade Secrets.

86.     Defendants further misappropriated the Trade Secrets by using the Trade Secrets without plaintiff's express or implied consent after refusing to close the Agreement and LOI.

87.     The Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

88.     Plaintiff has taken reasonable steps to maintain the secrecy of his Trade Secrets.

89.     The Trade Secrets have substantial economic value and have conferred a competitive advantage to the defendants.

90.     Defendants have and will continue to recklessly and maliciously misappropriate and use the Trade Secrets.

91.     As a result of defendants' current and continued misappropriation of the Trade Secrets, plaintiff will suffer imminent and irreparable harm and, alternatively, has suffered substantial damages.

92.     Plaintiff has no adequate remedy at law. Unless enjoined by this Court, defendants' acts of misappropriation will continue and plaintiff will continue to suffer irreparable harm.

## COUNT II
## <u>(MISAPPROPRIATION OF TRADE SECRETS UNDER CONNECTICUT UNIFORM TRADE SECRETS ACT)</u>

93.     Plaintiff incorporates paragraphs 1 through 92 of his complaint as if fully set forth herein.

94.     Defendants' conduct constitutes a violation of the Connecticut Uniform Trade Secrets Act, CONN. GEN. STAT. § 35-50 et seq.

95.     As a result of defendants' current and continued willful and malicious misappropriation of the Trade Secrets, plaintiff will suffer imminent and irreparable harm and, alternatively, has suffered substantial damages.

96.     Plaintiff has no adequate remedy at law. Unless enjoined by this Court, defendants' acts of misappropriation will continue and plaintiff will continue to suffer irreparable harm.

## COUNT III
## <u>(FRAUD)</u>

97.     Plaintiff incorporates paragraphs 1 through 96 of his complaint as if fully set forth herein.

98.     Defendants made false representations as a statement of fact to the plaintiff.

99.     Such representations were untrue and known to be so by the defendants.

100.     Defendants made such statements with the intent of inducing reliance thereon.

101.     Plaintiff relied on such statements to his detriment.

102.     As a result, plaintiff has suffered and continues to suffer and incur substantial damages.

## COUNT IV
## (INNOCENT MISREPRSENTATION)

103.    Plaintiff incorporates paragraphs 1 through 96 of his complaint as if fully set forth herein.

104.    Defendants made statements of fact to the plaintiff.

105.    Defendants made such statements with the intent of inducing reliance thereon.

106.    Such statements were untrue.

107.    Plaintiff relied on such statements to his detriment.

108.    As a result, plaintiff has suffered and continues to suffer and incur substantial damages.

## COUNT V
## (BREACH OF CONTRACT)

109.    Plaintiff incorporates paragraphs 1 through 80 of his complaint as if fully set forth herein.

110.    Plaintiff and defendants exchanged sufficient consideration for entering into enforceable agreements.

111.    Plaintiff and defendants formed enforceable agreements, each of which are fair, equitable, certain and mutual, consistent with policy and made on good consideration.

112.    Plaintiff fully performed the agreements.

113.    Defendants breached the agreements.

114.    As a result, plaintiff has suffered and continues to suffer and incur substantial damages and, alternatively, the plaintiff seeks specific performance of the Agreement and/or LOI and is ready, willing and able to consummate the Agreement and/or LOI.

## COUNT VI
## <u>(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)</u>

115.    Plaintiff incorporates paragraphs 1 through 80 of his complaint as if fully set forth herein.

116.    Plaintiff and defendants exchanged sufficient consideration for entering into an enforceable agreement.

117.    Plaintiff and defendants formed enforceable agreements, each of which are fair, equitable, certain and mutual, consistent with policy and made on good consideration.

118.    Defendants impeded or interfered with plaintiff's right to receive benefits under such agreements that he reasonably expected to receive under the express terms of such agreements.

119.    Defendants' wrongful conduct were taken in bad faith.

120.    As a result, plaintiff has suffered and continues to suffer and incur substantial damages.

## COUNT VII
## <u>(PROMISSORY ESTOPPEL)</u>

121.    Plaintiff incorporates paragraphs 1 through 80 of his complaint as if fully set forth herein.

122.    Defendants made representations and engaged in conduct calculated or intending to induce plaintiff to believe in the existence of certain facts and to induce plaintiff to act on that belief, and such representations and conduct were sufficiently promissory and sufficiently definite.

123.    Plaintiff exercised due diligence to know the truth, and he not only did not know the true state of things, but also lacked any reasonably available means of acquiring such knowledge.

124.    As a result of defendants' representations and conduct, plaintiff changed his position in reliance on those facts, and has suffered and continues to suffer and incur substantial harm.

## COUNT VIII
## (QUANTUM MERUIT)

125.    Plaintiff incorporates paragraphs 1 through 80 of his complaint as if fully set forth herein.

126.    Plaintiff rendered good and valuable services to the defendants.

127.    The defendants knowingly accepted and benefited from such services and represented to plaintiff an intention to compensate plaintiff for such services.

128.    Plaintiff is entitled to the reasonable value of his services.

## COUNT IX
## (UNJUST ENRICHMENT)

129.    Plaintiff incorporates paragraphs 1 through 80 of his complaint as if fully set forth herein.

130.    Defendants have been enriched and benefited from their use of plaintiff's confidential and proprietary information and the Trade Secrets including, for example, by accelerating the development of defendants' business.

131.    Defendants have been enriched at plaintiff's expense, as plaintiff has devoted substantial amounts of time, effort, money, talent, and creativity to the development of its property, including its confidential and proprietary information and Trade Secrets.

132.     Given defendants' inequitable misconduct, including their intentional and knowing misappropriation of plaintiff's property and confidential information, including the Trade Secrets, for the purpose of exploiting and utilizing the Trade Secrets for defendants' own financial benefit, equity and good conscience require restitution.

## COUNT X
## (VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT)

133.     Plaintiff incorporates paragraphs 1 through 96 of his complaint as if fully set forth herein.

134.     Defendants' conduct violated Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.*

135.     Plaintiff has suffered an ascertainable loss of money or property, real or personal, as a proximate result of the defendants having engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

## COUNT XI
## (FRAUDULENT TRANSFER)

136.     Plaintiff incorporates paragraphs 1 through 80 of his complaint as if fully set forth herein.

137.     Mr. Olschafaskie fraudulently transferred his membership interest in CMD to Mr. Collazo and Mr. Gagne in violation of the Connecticut fraudulent transfer act and common law.

138.     Neither Mr. Collazo nor Mr. Gagne paid reasonably equivalent value or other sufficient consideration to Mr. Olschafaskie for the transfer of his membership interests in CMD.

139.     Mr. Olschafaskie acted with actual intent to hinder, delay or defraud the plaintiff.

140.     As a result, plaintiff has been damaged in an amount to be proven at trial and all transfers of membership interests in CMD by Mr. Olschafaskie should be avoided.

## JURY DEMAND

Plaintiff requests a trial by jury

WHEREFORE, the plaintiff demands entry of judgment against the defendants and the entry of an award for a preliminary injunction; permanent injunction; actual loss; damages; reliance damages; incidental damages; consequential damages; an accounting; unjust enrichment under CONN. GEN. STAT. § 35-53(a) and 18 U.S.C. § 1836(3)(B)(II); punitive damages under common law and CONN. GEN. STAT. § 42-110g(a) and CONN. GEN. STAT. § 35-53(b); restitution; reasonable value of goods and services; specific performance; equitable relief; attorneys' fees, including under CONN. GEN. STAT. § 42-110g(g), CONN. GEN. STAT. § 35-53(b) and 18 U.S.C. § 1836(3)(D); exemplary damages under 18 U.S.C. § 1836(3)(C); a reasonable royalty under 18 U.S.C. § 1836(3)(B); avoidance of fraudulent transfers under CONN. GEN. STAT. § 52-552h(a)(1); an attachment or other provisional remedy under CONN. GEN. STAT. § 52-552h(a)(2); an injunction against further disposition of any equity interest in the Entity Defendants under CONN. GEN. STAT. § 52-552h(a)(3)(A); an appointment of a receiver for the Entity Defendants under CONN. GEN. STAT. § 52-552h(a)(3)(B); constructive trust; prejudgment interest; post judgment interest; costs; and such other and further relief as the court deems just and proper.

Dated: April 25, 2019
    Stamford, CT                  GORA LLC


                          By:/s/ Richard S. Gora
                            Richard S. Gora
                            Gora LLC
                            9 W. Broad St., Suite 550
                            Stamford, CT 06902
                            Tel.: 203-424-8021
                            Fax: 203-549-0410
                            rich@goralaw.com

                          ATTORNEYS FOR PLAINTIFF