UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
CARL BURCKHARDT,                       :
                                       :
     Plaintiff,                        :
                                       :
v.                                     :   Case No. 3:19-cv-00619 (RNC)
                                       :
MICHAEL J. OLSCHAFSKIE, ALEX           :
COLLAZO, ACE TRANSPORTATION LLC,       :
EAST HARTFORD CAB COMPANY, INC.,       :
ACE TAXI SERVICE, INC., and            :
CONNECTICUT MEDICAL DISPATCH           :
LLC,                                   :
                                       :
     Defendants.                       :
```

RULING AND ORDER

This case arises from plaintiff Carl Burckhardt's attempt to acquire a group of companies from defendant Michael Olschafskie.  Despite months of negotiation, the acquisition did not occur.  Burckhardt then brought this suit, alleging breach of contract and ten other claims.  He has moved for summary judgment as to liability on the breach of contract claim.  For the reasons below, the motion is denied.

I.   Background

In or around March 2017, Burckhardt and Olschafskie entered into discussions concerning plaintiff's potential acquisition of the defendant entities.  ECF No. 56-8 at 8-9.  During the period

1

of negotiations, plaintiff began working for the defendant entities.  Id. at 9-10.  He was paid for his work.  Id.

The parties never executed a written contract.  Id. at 35, see ECF No. 54 at 6.  However, the record includes several unsigned drafts of a "Letter of Intent" to effectuate a sale, and email exchanges from the period of negotiations reference an "agreement" and outline certain terms on which the parties had agreed.  ECF Nos. 59-3, 59-4, 59-5.  By November 2017, plaintiff had made at least one payment toward the purchase price "based on trust and [Olschafskie's] word that the contract was going to be ready to sign by November 1st[.]"  ECF No. 56-3 at 5.

Negotiations continued through most of 2017, but the parties' relationship ultimately broke down.  In late December 2017, plaintiff stopped working at the defendant entities.  ECF No. 56-8 at 12.

II.  Legal Standard

Summary judgment may be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  To defeat summary judgment, the non-moving party must present evidence that would permit a jury to return a verdict in his or her favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  In determining whether the moving party is entitled to judgment as a matter of law, a

court must review the record in the light most favorable to the non-moving party.  Id. at 255.

III. Discussion

The plaintiff has moved for summary judgment as to liability only on his breach of contract claim.  "The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages."  Meyers v. Livingston, Alder, Pulda, Meikeljohn & Kelly, P.C., 311 Conn. 282, 291 (2014).

Plaintiff, pointing to a series of emails in which the parties reference an "agreement" as to certain terms of the proposed sale, argues that the "formation of an agreement" element is satisfied.  He argues that he performed his own side of the bargain by making an initial payment toward the purchase price, and that defendants breached the agreement when Olschafskie failed to transfer equity in the defendant entities to him.  ECF No. 54 at 11.[1]  Defendants argue that summary judgment should be denied because the parties never had an enforceable agreement and, even if they did, plaintiff's motion

---

[1] Plaintiff dedicates a substantial portion of his brief to describing the work he did for the defendant companies and the benefits he allegedly conferred on them.  See ECF No. 54 at 3-6.  But, as defendants point out, any alleged benefit the defendants received from plaintiff's work during the due diligence period is both disputed and irrelevant to the issue whether the parties had a contract.  ECF No. 59 at 6.

3

fails to address defendants' affirmative defenses.  Because I conclude that plaintiff has not shown as a matter of law that the parties formed an agreement, I do not address defendants' other arguments.

"The existence of [a] contract is a question of fact to be determined by the trier on the basis of all the evidence.  To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties . . . . If the minds of the parties have not truly met, no enforceable contract exists." Johnson v. Schmitz, 237 F. Supp. 2d 183, 189 (D. Conn. 2002) (quoting L & R Realty v. Connecticut Nat'l Bank, 53 Conn. App. 524, 534-35 (1999)).  "Under Connecticut law, an oral agreement may be enforceable even if the parties never commit the agreement to a signed writing."  Heublein v. Rudder, No. 3:05 CV 1229 (CFD), 2007 WL 2472018, at *6 (D. Conn. Aug. 29, 2007).  However, the Connecticut Supreme Court has held that "[a] contract is not made so long as, in the contemplation of the parties, something remains to be done to establish the contractual relation." Klein v. Chatfield, 166 Conn. 76, 80 (1974).  Whether the parties intended to be bound in the absence of a formal written contract is determined based on the "(1) language used, (2) circumstances surrounding the transaction, including the motives of the parties, and (3) purposes which they sought to

4

accomplish." Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 444 (2d Cir. 2005) (citing Klein, 166 Conn. at 80).

Here, plaintiff does not claim that a written contract exists, ECF No. 54 at 6, and he has not shown that the parties intended to bind themselves without one. Plaintiff asserts that he submitted a Letter of Intent to purchase the defendant entities. Id. at 1.[2] Plaintiff argues that "despite not signing the Letter of Intent or any other written agreement for the sale," the parties "acted as if an agreement had been reached," id. at 2-3, meaning, presumably, that they had an oral contract. But, as plaintiff admits, the record shows that the parties continued to negotiate the terms of the sale until late 2017,

---

[2] To the extent plaintiff contends that this alone constituted a contract, his argument must fail. Plaintiff himself admits that the "[n]egotiations on the specific deals terms of the Letter of Intent ensued" and the parties never signed any version of the document. Id. at 2-3. Further, though plaintiff does not introduce the letter, defendants introduce several unsigned drafts of a "Letter of Intent" dated June 5, 2017. ECF Nos. 59-3, 59-4, 59-5. In addition to being unsigned, the letters include blanks and redlines, all indicators that the parties were still negotiating the terms of the Letter and did not intend to be bound by it. If more were needed, each draft states that "[i]t is understood that, except for the provisions of Paragraphs 5 [Break Up Fee] and 11 [Stand Still Agreement] . . . this letter of intent is not legally binding on the parties, but that it is intended only to evidence the good faith intent of Buyer and Seller to proceed toward the transactions contemplated hereby." ECF Nos. 59-3 at 6; 59-4 at 6; 59-5 at 6. Therefore, even if plaintiff could show that the parties intended to be bound by the unsigned Letter of Intent, that would not mean that they had a binding agreement for the sale of the companies.

5

when their relationship broke down. See id. at 3 ("Mr. Olschafskie concedes that Plaintiff was working from March 2017 throughout their continued negotiations until 'October, November, December' 2017." (citing ECF No. 56-8 at 12)).

The fact that the parties "regularly referenced in written emails the existence of an agreement" during this period of negotiations, ECF No. 54 at 6, does not prove that they had a binding contract. The first references to an "agreement" come in a series of emails from September 2017, in which Mr. Olschafskie references an "agreement" between the parties to effectuate the sale via a stock transfer. See ECF No. 54 at 6 (citing ECF No. 56-1 at 6 ("I want to do what we originally agreed to, the stock transfer based on payment or lease w [sic] option to buy."); id. at 4 ("I . . . agreed to sell you the company with a slow stock transfer or a lease w [sic] option to buy, we both agreed to that."); id. ("Once again we agreed to the stock transfer[.]")). But the cited excerpts are from an exchange whose purpose was to iron out the terms of financing and other terms of the sale, including plaintiff's future role within the defendant companies. See ECF No. 56-1 at 5-8. In context, it is apparent that although the parties previously expressed an intention to proceed via a stock transfer, they were still negotiating key terms of the deal. Their lack of alignment on those terms indicates "a lack of mutual assent

6

between the parties." Ceraldi v. Strumpf, No. 3:17 CV 1628 (WWE), 2019 WL 3340701, at *3 (D. Conn. Apr. 2, 2019) (no oral contract when parties had agreed on all terms of settlement except attorneys' fees).

Plaintiff also points to email exchanges between Olschafskie and his attorney, ECF Nos. 56-6, 56-7, and between the parties, ECF No. 56-4, indicating that they had settled on certain terms of the deal, including the purchase price and certain financing terms. See also ECF No. 5608 at 37-38 (Olschafskie's deposition testimony confirming alignment on those terms). But again, this is not enough to establish as a matter of law that the parties had an enforceable contract. For one thing, the language in the communications themselves indicates that there was more to be done to effectuate the deal. See, e.g., ECF No. 56-6 at 3 (Olschafskie's attorney details next steps, including gathering corporate documents for the buyers to review). For another, the surrounding circumstances do not support the finding that these exchanges represented a final, binding contract – the exchanges are from May and October 2017, respectively, and the record shows that the parties kept negotiating until at least November of that year. See ECF No. 56-2.

Finally, plaintiff cites two email chains from November 2017 in which the parties use the word "agreement" to describe

7

their relationship.  ECF Nos. 56-2, 56-3.  Again, these emails do not help his case.  In fact, one exchange begins with plaintiff sending Olschafskie a draft email that would advise the employees of the defendant companies that he and Olschafskie were parting ways because they "couldn't come to a mutual agreement."  ECF No. 56-2 at 8.  Later in that same exchange, Olschafskie emailed plaintiff saying, "we are still trying to get a [sic] agreement in place" and plaintiff responded that he was "losing interest" in part because Olschafskie "couldn't decide on terms."  Id. at 7.  Plaintiff wrote to Olschafskie: "Please let me know when the deal will be finalize [sic] so I can make my decision."  Id. at 4.  The parties' language and the surrounding circumstances all indicate that until at least November 2017, plaintiff was not sure whether he would choose to go forward with the deal and was waiting for Olschafskie's final word on the terms to decide.

    Further, the November emails show that the parties intended to reduce their agreement to writing once they finalized a deal. In an exchange from that same day, plaintiff asked Olschafskie "when the final draft of the contract" would be ready for review.  ECF No. 56-3 at 2.  Even plaintiff's partial payment of the purchase price was premised on the understanding that the parties would soon execute a written contract.  Plaintiff represented that he had "already made the first payment based on

8

trust and [Mr. Olschafskie's] word that <u>the contract was going to be ready to sign</u> by November 1st[.]" <u>Id.</u> at 5 (emphasis added).  In other words, the parties believed that "something remain[ed] to be done to establish the contractual relation." <u>Klein</u>, 166 Conn. at 80.  Given that the would-be contract's purpose was to effectuate a major business deal involving a multi-million dollar purchase price, multi-year financing, and the transfer of operational control and licenses, this is unsurprising.

The record suggests that until their relationship broke down, Olschafskie did intend to sell the defendant companies to plaintiff, and plaintiff did intend to make the acquisition, so it makes sense that they referred to themselves as having an "agreement" or a "deal."  But plaintiff has not met his burden to show that the parties had a <u>contract</u>; that is, a meeting of the minds on definite and certain terms to which the parties manifested an intent to be bound.  See <u>Johnson</u>, 237 F. Supp. 2d at 189; <u>Ceraldi</u>, 2019 WL 3340701 at *1.  Notwithstanding the parties' use of the word "agreement" in their email correspondence and their indications of alignment on some (but not all) terms of the sale, it is at the very least arguable that the parties did not understand the deal to be final prior to the execution of a formal written contract.  In any case, the record is clear that by November 2017, the parties did not

regard themselves as having a contract. If they did at any point before that, the record and the briefing do not reveal when it was or what its terms were. Therefore, on the record before me, I cannot conclude as a matter of law that the parties ever intended to be bound prior to the execution of a formal contract.[3]

IV. Conclusion

Accordingly, plaintiff's motion for summary judgment is denied.

So ordered this 31st day of March 2022.

/s/ RNC
Robert N. Chatigny
United States District Judge

---

[3] Because plaintiff has not shown that a contract existed, his claim of partial performance is unavailing. If the court must later reach the defendants' argument that the Statute of Frauds renders any contract the parties had unenforceable, the issue of part performance will become relevant. "[P]art performance is an essential element of the estoppel exception to the statute of frauds." Glazer v. Dress Barn, Inc., 274 Conn. 33, 63 (2005). But because I conclude that plaintiff is not entitled to summary judgment on the issue whether a contract existed, his claim of partial performance is not relevant here. See, e.g., Geary v. Wentworth Labs, Inc., 60 Conn. App. 622, 628 (2000) (no factual basis for a jury instruction on partial performance where the parties did not have a binding contract).